We will hear argument last in Global NAPs California v. Public Utilities Commission of the State of California. Counsel for the appellant. And let me just mention that there is an OSC order which we will discuss after the merits argument. So counsel should proceed on the merits of this case and then we'll deal with our recent order after the case has been submitted. So it will not take any, come out of anybody's time. Counsel, you can take the microphone. Does your honor have a written submission? We sent you a brief on the subject. You do have it. Okay. It's a letter with three attachments. Yes, exactly. No, that has arrived. Yes. I'm sorry. Excuse me. I have laryngitis. Okay. My throat's acting up. Okay. I'm sorry. Would you please reset the clock to 15 minutes and we'll deal with the merits only at this stage. Thank you. This is a basically a summary judgment case that in front of the commission we signed a contract. Excuse me, counsel. I'm sorry, but I don't think you introduced yourself for the record. I'm Joel Davidow. Mr. Davidow. Yes. From the D.C. and New York bar. I'm sorry. My voice is quite terrible. The case involves two types of internet telephones, internet telephony. One is you break the stuff in little things and you call the internet. You call AOL to have a chat room. And this was a business our client was in from 98 to, well, ever since, but except it fell apart in 2003 when everybody got DSL so you didn't have to dial up internet anymore. We started in 2003. We came to California and saw what's called the 251 agreement, which is a mandatory agreement with Cox. That agreement exists and was signed. There was no arbitration of it. There was no evidence as to what was said by anybody to anybody about it. So as far as the record shows, it was a voluntarily negotiated agreement between the two companies. Well, whether there were three words of negotiation or a thousand, we don't know which provisions. We do know this. Well, it wasn't an arbitration before the public utility. No, no, it was not. At some point an agreement was entered and signed. That's absolutely true. An agreement was entered and signed. The companies began doing business with one another. Yes. The only term that mentions internet traffic in the thing is a clause which says that when we, when they send internet business to us, that it will be bill and keep, which means they won't pay us anything. Of course the agreement itself concedes we're talking about intralata, correct? No. Sorry. Sorry, intralata. I'm sorry. Well, if you are doing a dial-up internet, the first connection is always local. So it's intralata, but there's no general statement. There is a statement in the agreement that things that aren't intralata would certainly not be billable. The intralata comes up in two contexts. One, if it's intralata dial-up, you don't pay. Nobody pays anybody. And then there's no further mention of the internet. Yeah, but we're talking about jurisdiction here. If it is concededly intralata, then the commission does have powers to require payment of access charges, is it not? Well, not if it's VoIP, because VoIP is jurisdictionally interstate. And something that says state can't be intralata. There wasn't any VoIP, VOIP I take it you were talking about, voice over internet protocol? Yes. There is no VoIP exclusion in the agreement. There's no VoIP inclusion either. There is simply an IP section which talks about IP going this way, and then there is a tariff section which says anything else, if you send us some traffic that comes within our tariff for intralata toll traffic, then you'll pay us. And then the question is, we said our traffic's VoIP, and under federal law, if it's VoIP, it's not intralata or toll or traffic. And we have cases, most recently the two best cases for us came out after the briefing. The opinion for us by Judge Rakoff in New York, and the opinion for us by, well, for our supplier by Judge Robertson. Both of whom say, well, yes, the tariff may say intralata toll traffic, but as Judge Rakoff said, I've heard GlobalNap's witnesses, and none of their stuff is reliably intralata, because everybody who goes in VoIP can pick any phone number. If I go to Vonage, which testified in New York, and I live in California and want a New Jersey number, or vice versa, they'll sell it to me. And then they'll give me a little gadget, and I can go anywhere in the world and call. And so that's why the FCC decided in 19, 2004, that all VoIP would be treated as jurisdictionally and irrefutably interstate. Mr. David, is the problem here that there is an imbalance in the flow of traffic because of the nature of the data that's being downloaded from Internet websites? No, it doesn't. Let me give you a hypothetical, if my question is not clear. The customer in Orange County dials up his Internet service provider, and at some point passes over the lines of Cox and Global and whoever else, to reach the server of the Internet provider, and then starts surfing the web and downloading pictures and movies and all that stuff. So then all this data is being pushed back, and eventually is returned or terminated at the subscriber's location in Orange County. Have I got that right? No, you're right. I don't have that right. You were fine as far as you went. The reason that Global agreed that it would terminate dial-up Internet for nothing was because the FCC had held that in the old recip comp, where I call you and you call me at the end of the month, there's a balance. When you call the put up connections to the Internet, and they connected, and at the end of the month, there was no reciprocal. And so they were doing great. And so they went to a lot of states, including this one, to make some more money. Now, they got paid by two people. They got paid in the old days by people like Cox, and also by the people who serviced the Internet, like Quest. Cox and these people went to the balance. We're not going to make you pay anymore. So Cox said, we won't pay. But there's no reciprocity. The circuit is open for four hours while the guy serves the net, and in that time, all this traffic is flowing back to the subscriber, and Global takes the position that it doesn't have to pay for that because it's not a call that terminates. No, not a position. Sorry. No. We said, we agreed that everything going this way, we won't be paid for. We agreed to do it for free. We then entered a totally different business. The Vonage, in one case, our client is AOL. In the new business, the client is Vonage, and the client is our own company, Broadports. And that client lets you go on your computer and you make a call. And if you make a call, let's say it's Skype to Skype, you pay nothing. If it's standard, which is long line to long line, you pay two cents a minute. They're called legacy rates. If it's from the computer to Cox, then it is going from broadband, also called internet, to the Cox, and the FCC calls that a net protocol conversion. That is, it started in one technology and ended in another. The statute says that telecommunications is messages that travel unchanged in form or content. The FCC and even the California PUC have said that VoIP calls do not pay normal access. They said in 2004, they quote, didn't say it after that, but they never said they were wrong. But parties are free to moderate that rule by mutual agreement, are they not? Right, but of course they wouldn't. The New York record judge Rakoff says, we get paid two tenths of a cent per minute to do our stuff. It's in his opinion. This is a two cent a minute charge. Obviously, if somebody said, would you pay me two cents a minute for something, you only get two tenths of a cent, you would say, well, I have to sign in blood and you're going to have to be clear. We showed the commission that there are all over the industry, after 2004, what are called VoIP clauses. The VoIP clauses are absolutely consistent in their form. But there is no VoIP clause in this agreement. Well, that's my point. Whenever people, since VoIP is not telecommunications, or probably won't be, then everybody who wants to be paid something for VoIP says, well, the FCC hasn't clarified. And would you pay us something, would you pay us the usual rate, which is 007, which is what the Wisconsin commission did, or 0045. In other words, that if the traffic is normally not telecommunications, and you're going to pay for it anyway, you're going to bargain for it. You're certainly not going to pay list price, because you're betting on a future FCC ruling, which is highly unlikely to be anywhere near that high. There's no evidence in this record that your client ever approached Cox and said, look, we've got a dispute here, let's renegotiate this agreement to address it. Instead, your client said, I'm not going to pay for all these services, because I don't think I have to. And it didn't comply with the provisions in the contract that said you're supposed to deposit into the escrow account the disputed sum. Instead, it just said we're not paying anything. Well, exactly what negotiations were held between the parties aren't clear. It is clear that we went in for... I didn't see any evidence that there were such negotiations. Well, either way, when we said, look, Cox, this is VOIP, which seven courts have now held as a total defense, and Cox didn't say, well, would you pay something, or we'll give you less. There's no indication that Cox said anything. And in the cases we've won, in the Maryland Commission, in the New York Commission, it was the Commission that said the parties ought to negotiate. So, you know, sort of like we're the bad guy, the negotiation can come out, as usually, by their saying, if you'll pay for VOIP, I'll give you a 90% discount. But here we're on an abuse of discretion standard so far as the CPUC interpretation of the agreement is concerned. Are we not? No, because in each of the cases it's been held that when you construct words contrary to the federal statute, you are making a federal mistake. That is the conclusion that we start with the simple fact, which is? Well, the simple fact is there's an ICA here that went before the CPUC. It has the authority to construe it and to interpret it, and to challenge it, one has to establish that their interpretation was arbitrary and capricious. Am I not stating it correctly? No, it's not correct, because they denied a hearing under summary judgment. Summary judgment on a contract requires the contract be unambiguous. There were three possible interpretations of this contract. One, which is what Wisconsin did with it, which is if you pay nothing for Internet going one way, you interpret it, you pay nothing for Internet going the other way. The second interpretation... Are we with our PV case? Yes, but I'm saying every case on contract, interpreted by anyone, says that unless the contract's unambiguous, you have to allow a hearing on parole, evidence, and facts. Beyond that, in this case, the key point was that we said we wanted a hearing to prove that the stuff was nomadic boip, and they said that's irrelevant. The statement that our being a boip producer was irrelevant is federally erroneous. I will give you the most recent decision, which I had not cited before, because there's so many that go our way, put simply. This is the Northern District of Ohio, Judge Marbley, and... One second. Do you have that? It's 2010 Westlaw 987053, and... Is this a case that it was not referred to in either brief? No. I'm sorry? It is not referred to. Well, then, before you leave the courtroom, please give a gum sheet to the deputy clerk in triplicate... Yes. ...and serve your opponent. Yes. What's the name of the case? It's Ohio Bell v. Global Naps. And in Ohio Bell v. Global Naps, there was an ICA. The ICA said that if you send stuff that isn't covered by contract expressly, it's subject to the tariff if it's in traumatic toll traffic. Is that the same as this agreement, this ICA, or is this a different provision? They're not identical, but they both have the same feature, which is they end with a statement that all traffic other than the name in advance is subject to, quote, the intra-lot of toll traffic thing. And at that point, AT&T moved for summary judgment because the number of minutes and the sending was all clear. And Judge Marbley said, well, we don't know three things. One is we don't know whether it was void, but we have to know that. You simply have to know that. Secondly, he said, we have to know how each side classifies void because there's nomadic void, there's non-nomadic, there's void in the middle, which I can explain. And he said, lastly, we have to know what the parties really meant because we don't have any parole evidence because we never had a fact hearing. And this contract is just not clear as to how the parties were defining words like intra-lot of as it might have applied to void. All right. Thank you, counsel. Your time has expired. We'll hear from the other side. Good morning, Your Honors. Chris Witteman for the California Public Utilities Commission. Your Honors, this dispute does not involve ISP-bound traffic, and I think that was subject of some confusion in the questioning. This dispute is about and only about traffic flowing from Global Naps of Switch to in Los Angeles down to Orange County and terminating on plain old telephones in Orange County. It is telephone traffic. It's not Internet traffic. It may have originated in an IP world where the call is broken up. We don't know that for sure. The FCC has said even when that's the case, state commissions can adjudicate. A very recent case, the UTEX case, which we can provide to the commission, the feature group IP also says, and that was cited by the amicus AT&T, says that access charges can be awarded on Internet traffic. Anyway, to return to the nature of the traffic here, originating number assigned to Global Naps, terminating number assigned to Cox, the contract calls out these numbers that are found in an obscure document called the LURG, which is mentioned in Cox's declaration in the summary judgment proceeding before the commission. The LURG identifies these numbers as belonging to Global Naps, belonging to Cox, and identifies their physical coordinates. On that basis, according to the contract, the calls are billed. I've heard counsel say that VOIP is exclusively federal and your commission has no powers with respect to VOIP issues. Your Honor, I would like to see the court that has said that. As the trial court framed the issue here, the issue is quite simple. Has Congress or the FCC in any way communicated an intent to preclude state commissions from enforcing interconnection agreements that require the payment of interconnection charges on VOIP calls that terminate on the public switch telephone network? Or, to put it in my own words, interconnection charges on allegedly IP-initiated calls that terminate on the public switch telephone network. And the trial court answered that question in no way. No way. There's no clear indication that states were preempted from making that determination. Well, respond directly to Mr. Davidow. He said that there's an FCC ruling and apparently there are some cases that... The FCC ruling, I assume it to be the Vonage case, was a 2004 ruling. It involved nomadic VOIP only. In other words, where you have two computers connected to each other. You don't have that nexus on the public switch telephone network. Secondly, there was no interconnection agreement involved in that case. Third, GlobalNaps has a license from the California Public Utilities Commission, whereas the whole point of the Vonage case was that Minnesota was preempted from requiring a VOIP carrier from getting a telecommunications carrier's license. And this is key. This is critical. GlobalNaps cannot connect with any other carrier on the public switch telephone network unless it is a carrier. That's what 47 U.S.C. 251 says. So GlobalNaps comes to us. It gets a license from us. It proceeds to interconnect with other carriers in this area. It sends its traffic to them pursuant to interconnection agreements and in some cases pursuant to tariffs, but in our case an interconnection agreement. When the bill arrives, GlobalNaps says for the first time, this traffic is exempt. We don't have to pay. And you know what? They've done this all over the country. And this raises a serious public policy issue. If GlobalNaps isn't paying, someone else is. Is there any case throughout the country which upholds their position? Not that I know of. I am not aware of any case reviewing a state commission determination on an interconnection agreement. ICA. An ICA that says the state was preempted from doing this. The underlying problem here, and Your Honor is probably aware of this from the Brand X cases, is this confusion of information service and telecommunication service. But after the decisions in and around Brand X, the FCC has essentially retreated from that position and said, wait a minute. Information services have a telecommunications input. And any exemption that applies to information services certainly doesn't apply to the intermediate carriers like GlobalNaps or the telecommunication carriers that are handling this information. This is the telecommunication substrate of the Internet, if you will, that we're talking about. So, excuse me. So your position is that if the mere fact that the traffic further up the line may have been converted into digital form but then back into analog form, by the time it goes from the switching center in downtown Los Angeles to the customer in Orange County, it's in analog form like any other call? Well, these carriers are introducing IP all over their network. It all goes on the same wires. This is just a different protocol, how the traffic flows on those wires. So I couldn't tell you that with 100% certainty. But it is by, I think, consensus here conceded that that is public switch telephone traffic from that switch down to Orange County. And that's what we're dealing with. And there's nothing, there's no expression and certainly no clear expression by Congress or by the FCC to take that traffic out of the interconnection regime. The VoIP traffic? The VoIP traffic, assuming that it is. And we assume only for purposes of this federal question that some of it could be. So even assuming that, there's this transmission component and there's nothing that takes that transmission component out of state adjudication. We looked at two declarations, one by Cox, submitted by Cox, that set out the typical traffic under oath. This traffic originates, it showed a sample call detail record, which is what is generated by the switch. It originates on this GlobalNaps number and it terminates on this Cox number. GlobalNaps didn't contest that. They came back with a declaration. I can give you the exact site of their declaration. I thought I could give you the exact site of their declaration. It's around 637 in the excerpts of record. They came back with a two-page declaration, page 637, I believe, in that area. Their declaration said simply, upstream. Upstream, it's all enhanced service providers. Did not contest the validity of that call detail record. And we believe that, again, this part of the analysis is a state law contract analysis. As Judge Posner in the Seventh Circuit said, these cases are not based on federal law in any realistic sense, but on a price term in a contract. And we just have this sort of federal regime that frames the issue. But it's still, at bottom, a state court issue. And so the question is, has the FCC or Congress in any way reached in and said, you may not adjudicate that sort of a dispute? And it's just not there. And, in fact, recent pronouncements by the FCC telling the parties to go back to Texas to adjudicate an IP to PSTN to the Texas Commission. They sent it back to Texas. In Illinois, they sent cases back. The Illinois, I believe it's the Illinois court, 461 FSUP, has said, we can't wait for Godot. We can't wait for the FCC to make some pronouncements on this. This area is difficult. We've got a contract or a tariff in front of us now. We've got to deal with that. So that's what the California Public Utilities Commission did. So if the court has other questions, I'm prepared to respond to them. Otherwise, we would rest on our brief and ask that the district court be affirmed. Excuse me, Judge. I just wanted to ask you if you are familiar with the case that Mr. Davidow cited from Northern District of Ohio with the Westlaw site. No, and that appears to be, and counsel can correct me if I'm wrong. First, I've heard of that case. That appears to be a case where the interconnection agreement was brought first to the court and not a case where it was sent or ended up in front of a public service commission or public utilities commission that then made a determination, brought its technical expertise to bear to make a determination as to what the contract really said. The appellant's brief suggests that it was error to deny a fact hearing before the CPUC in this case. Your Honor, as long as I've been practicing law, contract matters are one of the prime subject matters of summary judgment. And here we had a classic summary judgment motion, declarations on each side. The judge looked at those declarations and said, there's no real issue of fact. I'm thinking of Judge Schwarzer's voluminous writing on what actually constitutes a material issue of fact. And this certainly is not one. There is no question that the call detail records on this traffic pinpoint a GlobalNav switch in Los Angeles and a Cox switch down in Orange County. So we do follow 437C of the California Code of Civil Procedure as a guideline. But we are also independently empowered by the California Constitution to make our rules and procedures as to how we adjudicate these sorts of disputes. And although this is, at bottom, a state court, state law determination, the federal law, the 1996 Act, has sent an awful lot of these interconnection disputes our way. We do the best with them we can. At any given time, we have a number in-house that we are adjudicating. Here, it appeared to the administrative law judge, affirmed twice by the commission and affirmed twice by Judge Morrow, three times actually by the trial court, that there was no issue of fact, material issue. Was there also litigation in the state court? Yes, there was litigation in the state court. They brought the 437 issue to the state court. They also brought the federal issues to the state court, which we felt was inappropriate. Even though we felt, at bottom, this was a state law matter, you don't bring these sorts of preemption issues to a state court. They took that matter all the way up to the California Supreme Court, lost, and then went to the U.S. Supreme Court, review denied. So now we're back in front of Judge Morrow and the trial court. At one point, they were willing to dismiss their complaint without prejudice. We requested that the dismissal be with prejudice because we looked around the country, we looked at this incredibly litigious company around the country, and we just were unwilling to abandon the work that Judge Morrow had done and the significant amount of work that she had put into the preliminary injunction hearing and ferreting out this conceitedly difficult area of federal law. And we said, no, we want this to be with prejudice, and we had a briefing on that, and that's in our supplemental appendix, and I recommend that to you. And Judge Morrow said, I will dismiss this without prejudice as long as you agree not to bring your federal claims to state court and agree to pay the California Public Utilities Commission for its fees and costs incurred on these issues today. And Global Navs declined that, whereupon the CPC moved to dismiss. Thank you, counsel. Thank you. The case just argued will be submitted for decision.
judges: Lefkow, O'scannlain, Tallman